Are we ready to proceed? Yes, Your Honor. Then, Mr. Buchholz? Buchholz. Buchholz. Thank you very much. May I proceed? Morning, Your Honors. This invention may seem kind of simple, but it's actually a significant advance in ergonometric keyboard design, which adopts the idea of trying to use the joints of your fingers and thumb rather than just the tip to actuate keys. My third argument is that we never get to a claim of public use because this Cherry Model 7 thing here did not embody all the claims of the 322 and 477 claims. If we start looking at it that way, can I ask you a question about infringement? It struck me that there was a difference between your opening brief and the reply brief with respect to the Nokia phone. As I read the opening brief, you seem to agree that some of the keys of the Nokia phone are from the concavity. There is none. And in the reply brief, you say that in some models of Nokia phone, the keys are all within the concavity. It depends on how you define concavity, Your Honor. It depends on the model of the phone. And perhaps there's been a little too much oversimplification in the brief, streaming all the phones the same and all the joysticks the same. But am I correct that in your opening brief, you did not argue that all of the keys, with respect to some models, were within the concavity? I don't think I argued that. I've always thought that all the keys are within the concavity. But for no other reason than the concavity is this hollow in the housing here, and all the keys are within it. Now, there's issues the district court rejected our argument. You could just look at it from the front and say, here's the concavity. All the keys are within it. And we started looking at the side as sort of a secondary argument. But I never attempted to abandon any of the arguments. Well, just I want to be clear about this. Do you agree then that under the district court's construction, that in all of the Nokia models, at least some of the keys are above the concavity? I guess I find that question difficult to answer because the district court seemed to think there was no concavity at all. So I don't fully understand the question. I think the district court thought that in all the cases that the keys were not within the concavity. And if we look at the evidence, and we look, it depends whether we look this way or look sideways, some of them do have some keys that stick out, and some of them have some keys that don't appear to stick out. And it's conflicting evidence in the record on that because there's different side-by-side pictures in the phones that show different degrees of stick out. Well, did you put in testimony by an expert that examined that question? We put in the sideways phones through the claims charts, which in our view were put in by an expert. So you're asking us to look at the phones ourselves? Or the pictures. The pictures are in the record. They're fully in the record. They're in the claim charts. The charts were put in by somebody we regarded as an expert. The district court differed on that point. How is a joystick embodiment hand-held? We take our hand and we hold. But you just gripped it, and didn't you make a very clear distinction between gripping and hand-held devices in your specification? Now don't you mention them both and seem to distinguish between the two? I agree that in the specification at one point it said the housing has a grippable portion, and another place it said it had a hand-held device. In column 1, line 31, it says gripped and held in one hand. So how do you... if they're the same thing, of course, you wouldn't need to make the distinction. I guess I would say that that is bad drafting, but I would say this. The law says that you would say that those two words have different meanings unless it's otherwise clear from the specifications. And we would say it's otherwise clear from the specifications because this precise embodiment, this idea of a control stick that sits on a larger piece of machinery, that is specifically disclosed in the specifications. And so I think if the patent is read fairly as a whole, one assigns essentially the same meaning. The claim itself, though, mentions hand-held and gripped in the same claims. I understand that. So now we're into the legal definition of the invention, and you seem to have drawn a distinction between gripping and holding. I wouldn't have done it that way myself. The question is the meaning of the claim. Well, if one looks in the dictionary, the two words have the same meaning. I guess I don't see a distinction in the dictionary meaning, and I don't know why two words were used in that case. But I think it's strange and artificial to try and assign them some different meaning. It's sufficiently different to exclude an embodiment that is expressed in the claim in the specifications. That's, I think, all I can say on this point. Well, except that figures 1 through 8 at least show that it's a holding, means supporting independently. Figures 1 through 8 have pictures of a device that would be held in the air. Yeah, it's exactly what I tried to say with words. Right. It is gripped, and it is held. It is held. And it is held. But if you look at the dictionary meaning of the word held, there is no in-the-air component in any of the alternative meanings in the dictionary. Or in the case of gripped, what the inventor is trying to distinguish between is something like this, like the Cherry Model 5, these full keyboards. This is not a hand-held device. I mean, I can hold it in my hand, but it's manifestly not a hand-held device. And isn't that the point? You seem to evade the public use by saying you're not holding that keyboard. Why wouldn't we apply a similar definition of hold to preclude infringement of this joystick? My best answer is that because we expressly claim that embodiment of the device in the specifications, and I think it's generally regarded as some sort of stretch in construction if one reaches out to exclude an embodiment that's expressly set forth in the specifications. It can be read as grippable. It has a housing with a grippable portion. The thumb hangs free like in the other device. The only difference is if it happens to be attached to something on the bottom, the attachment to something on the bottom is simply not semantically connected to held or gripped. Excuse me, I was just going to say one other thing. The embodiment that you claim is this column 7, line 52 embodiment, right? Which only applies to device 140, figure 7. That's correct, right? So it's applied to 7, the device that you showed us earlier. No, no. There's a different picture which shows a base on the thing where it sits on the base, and that's different than the one that you hold up in the air. And that picture, it has a smooth bottom on the base. You're saying that 142 attaches it to something? In that case, I believe it's just a base. And there's a suggestion, for example, that one could put a scanner under the base. But the language of the specification says… That's the whole point. It seemed to be attaching this figure 7 via a cable to some larger device. So I'm not sure the control stick on a larger piece of machinery, as it's characterized in column 7, is anything like the joystick that you've been telling me is handheld. And I've been seeing it's grippable but not handheld. All I can say about that is that the larger piece of machinery can be a giant jet airplane, it can be a box this high, or it can be this little base with some more buttons on it. But if the larger piece of machinery is attached to the grippable and handheld device via a cable, rather than as it is here, there's a distinction as to the meaning of hell, isn't there? Because then it is still somewhat free of movement in my hand, whereas this does not operate if you pick up the console. I guess I would find refuge in the words substantially. The specification says a substantially larger piece of machinery. And everyone was aware of prior art involving these sticks and airplanes. Size is all that matters there is what you attach the cable to, right? No, no, no. If it's a control stick, a control stick is in a way a reference to this huge body of prior art involving flight control sticks on airplanes and so forth and so on. And there's no limitation whatsoever to things that are really connected by wires. That's not any sort of limitation that appears to be a pattern. With that, I'll let you move on. I think it's pretty clear that the Cherry Model 5 doesn't embody all the limitations. We do have some contrary testimony by the inventor, and some statements he made in violence and pro se pleadings, but there's nothing here that grounds for sticking him with a distopper, because there's no showing by these folks that anything he said was material to any prior decision, or that it should be of conclusive effect when it's contradicted by the devices themselves. It surely is evidence that they will be entitled to use against him. He did say that he and the Cherry Model 5 embodied the invention. He did. He was just wrong. He knows something that he's not a patent lawyer, and that evidence is fair to use against him, certainly, but to treat it as conclusive when it's contrary to the device itself, which is the best evidence of the proposition, seems a little unfair. But even if we were to treat the Cherry Model 5 as embodying all of the elements, there isn't any clear and convincing evidence of public use. For one, the invention was not ready for patenting at the time of this development. The... Counselor, going back to submissions for a minute, though, Nokia actually asked for admissions, and they stated in their material statement that the Cherry Model 5 keyboard embodies Claims 1, 2, 5, 6, and 8 of the 477 patent as admitted by MKC. And in response, MKC admitted this fact, except that it contended that... And you actually say, admitted, in your responsive pleadings. And it said that it is apparent from inspection of the device it does not embody Claims 5, 6, and 8 because it does not have any clusters known for selectively positioning adjustments. So, having you, in fact, admitted, made an admission that Claims 1 and 2 are embodied by the Cherry Model 5... Now, you know what? Technically, I agree with you. I'm not sure they are. But you admitted it, and you had an opportunity, didn't you, below, to withdraw admissions. At any point in time, you could have made a motion in the district court to ask to withdraw your admission. You never did so. And so now you want us to just disregard what is a fundamental tenet of district court litigation, that you make admissions, they're entitled to rely on those admissions. When you say, I admit it, they then don't have to put forth proof any longer. And you never even attempted, below, to withdraw that. So how can we not hold you accountable for that admission? I'd say three things. First, the district court relied on the inventor's testimony, not on the admissions. Second of all, the admissions are of a limited lifetime and apply only in the context of summary judgment. They don't persist past that. And third, I would say that even if you take an admission on a couple of those claims, they don't support the district court's decision to throw out the entire patent. Well, I agree with you on the last point. But with regard to claims one and two, you made an admission. You didn't even ever, at any point in the entire litigation, attempt to withdraw it. I understand. I was under the impression that public use sort of meant public use. And I didn't even think this stuff was important, because it was obvious to me, at least at that time, that there was no public use at all. And with regard to that, I would say that the third paragraph of it No public use at all. You mean because you had these NDAs? Because there was no use in terms of the actual use of the product for any purpose like entering data into a machine because it was never actually used. Now, wasn't there a young lady? I just don't remember her name. Sheila Lanier. Ms. Lanier. That came later. That was within the one-year date. So that one's okay. It does actually come before the one-year date. There are two patents, right, that were both at issue for public use, the parent and the continuation. And I understood that Mrs. Lanier's actual use came within the critical date for one of the two but not for the other. The only admission was made with respect to the 477, not the 322. That's what I would say about that. I would also say that we specifically denied in front of the district court that the Cherry Model 5 was a reduction in practice that far back. Well, you did pass this thing around, right? I mean, you passed this thing around. It wasn't plugged in. The only evidence of it being plugged in and actually inputting electronic data was Ms. Lanier's use. But apart from that, isn't it true that in the course of trying to solicit funding, you showed the keyboard prototype to people, let them play with it, see how it is ergonomically better and all of that? That is certainly probably true that they were shown to these potential investors under these NDAs. They may have been out of play with it. I don't remember how specific the record is in that regard. And our argument is that's just not a public use. Because it wasn't plugged in? Because it's not a use and because it's not public because of the NDAs. How is depressing the keys to see their ergonomic functionality not in use? Well, we have cases in the record like 3M where 3M has these samples and they mail them out, okay? But they don't know if anybody ever used them. And the answer is 3M wins. No public use. Or we have Moleculon where... Is it because it wasn't plugged in, though? What I'm trying to understand from you is when they're working on the keys, is your distinction that it wasn't because they're pushing the keyboard. Of course, it's not plugged in or anything, so there's nothing carrying that screen anywhere. That's the distinction that you're drawing. On the use element, which is one of three or four reasons why there's no use. Here's the problem with that. Claims don't require this thing to be hooked up. This is a claim to a keyboard, an ergonomic keyboard. It is not a claim to a system involving a keyboard. So how is it not a public use to depress the keys on a keyboard when that's the only thing it claims to? Because I would say that the public use statute is to prevent this guy from going out there and exploiting competitively his invention in the marketplace. And that never happened. The fact that it's shown to some potential investors, that just has nothing to do with the policies under Section 102B. Well, your answer to Judge Moore ought to be that the language of patents is an input device for the transmission of information by a human operator to the electronic system. Well, thank you. That's a better answer. Back to my question. Why do you say handheld if you aren't going to be able to hold it with a single hand and manipulate it independently? I guess because I view this as being handheld and manipulated with one hand like this. And the concept of holding it in the hand is to me analytically distinct from the question of holding the hand in the air. Adding the word in the air to me seems strange and artificial in light of the specification. I mean, one can't hold this in the air and one can generate electronic signals with it. You might not be very good at controlling the airplane. But, I don't know. It's, in theory, I don't know what to say about it. It's a simple act. I don't know what to say. But wouldn't one of skill in the art perceive handheld as distinguished from grippable and as shown by the embodiments in the figures and the descriptions in the package to be something which is independently held with a single hand? I think they would focus more on the housing and the degree to which there's something about the housing that makes it grippable rather than just in the air. And these accused devices are going to work in a metrically designed, even the phone tones, the thing on the side with the lines here. There's ways in which there's a grippable piece and that, I think, is what whoever wrote the package was getting. Thank you. We'll see if it reserves some rebuttal time and we'll restore three more minutes to you. Yes. May it please the Court, we have divided up the arguments this morning. I will be addressing the infringement issues for Nokia. I also will be addressing the invalidity issues on public use for all the defendants. The other co-counsel will rise to speak for each of their respective clients on the infringement issues for those clients. Judge Dyke, before I start, the answer to your question was yes, he didn't stay consistent in his argument as far as Nokia is concerned in his opening brief and his reply. Yes, there was a submission by Mr. Stewart in the record trying to explain some of these points about infringement. I would leave to your honors to read footnote 5, appendix A61 through 62 as to Judge Aiken's views as to Mr. Stewart's qualifications, I think, being charitable. Judge Aiken made some comment that his best skills seem to be knowing which chair to pick and, of course, she plainly did not accept Mr. Stewart's testimony as being an expert testimony. Did he testify that the keys were all in the depression in respect to the Nokia device? Not clearly, phone by phone, no, he did not. But the key point with respect to your honor is Judge Aiken did not accept Mr. Stewart's testimony as being a proper expert testimony. There wasn't a formal nod with the motion, but if your honor looks at that footnote, it's quite clear what her reaction to Mr. Stewart's testimony was. Your honor, how do you deal with the embodiment that seems to attach the handheld device to a larger piece of machinery? I'm embarrassed to have to admit this to your honor, but because Nokia phones aren't that structure, one of my co-counsel is going to address that particular point as far as the handheld. You know how much I dislike this. You're dividing it up. If we don't get to them in the time, that argument we just won't get to. So you can proceed and try and divide things up, but the court doesn't divide things up. The court asks questions and expects answers. Counsel, would you mind talking about validity? You're going to talk on that, right? Yes, ma'am. Okay, so tell me how you overcome the public use component. Certainly when Ms. Lamita typed it in and she did it, I think that's a public use. Yes, your honor. At least a use. I mean, there's certain questions about the rest of it, but that's only with regard to 477 and 322. It's actually the 322 patent, your honor, which is the only patent that was pressed as far as Nokia was concerned for purposes of encryption. We don't have a public use finding, do we, with respect to the 322? Yes, we do. As to both patents, Judge Aiken found that both patents were valid. Yeah, yeah, but I wasn't under the impression that there had been an admission that all the features of the 322 had been in public use. The Cherry Model 5 was said to be in public use of the 477. As well as the 322, your honor. Both. Before you get to the admissions, could you focus in on the public use part? Yes. How was it used? I mean, are you contesting that passing around the keyboard is, in and of itself, use, even if it's not plugged in? Yes, because for several reasons. One, this court's precedent, TP Labs, as well as Watson v. Allen from the D.C. Circuit, which goes back to the Egbert United States Supreme Court case, use is a very, very broad term in the statute. Watson v. Allen goes so far as to say, quote, it may be fair to include the public use of the system. And then Moleculon, it was passed around to employees, anybody who walked in the embedder's office for months, use wasn't very broad then, was it? Moleculon, your honor, I believe, That was the Marx case. That was the party, and I believe it was personal friends. Anybody who walks into his office for a period of many years, I stand corrected, Judge Moore, you're correct. There was no attempt in Moleculon to make any sort of commercial use. And under the circumstances, But there were plenty of uses. Was there a commercial use of the Cherry 5? Yes, there were numerous commercial uses. Wasn't it plugged in? Your honor, it didn't have to be because, as Judge Moore pointed out, The claims say it has to be plugged in. Your honor, I disagree respectfully. I also note that in the body of the patents itself, in several places, the inventor stated that the operation of the coupling of the claimed keyboards to a computer, which is well known, is not part of the invention. That has been explicitly stated in the specification of the 477 patent. It's not part of the invention, but it's part of the use of the invention. You have the Minnesota mining case, which seems to clearly contemplate that this is not just viewing something. It's going to make the use. It has to be used the way it was intended. Your honor, with respect, 3M, that particular case, turns on the fact that the disclosure was not enabling it. It does not, with respect, turn on the question of use. To hit that point precisely, how do you know if the keys were hit accurately, if it wasn't even plugged in? The question of accuracy is not... No, no, no, no, you have to work. This thing has to actually enter the proper keystrokes. It can't just feel good. It's got to actually feel good and work for its intended purpose, which is to properly have keystrokes entered. How do you know that it wasn't plugged in? You didn't. Well, we know from... It was not enabling disclosure. We know... Well, your honor, first of all, there are evidentially admissions all over this record by the inventor and by MKC, the company, 36 testimonies that this has been admitted, on one side and down the other, that... Sheriff's not a lawyer. He makes what seems to him to be an off-the-cuff statement. We don't accept lawyers. I mean, inventors' testimonies for very much anyway because they're not people with skill in the art. Well, if he had just been the inventor and the issue was do you accept his testimony on the mark of complaint construction, I might agree with your honor. He was testifying as a corporate representative of the 30B6. And as Judge Moore pointed out earlier, if we start having, at the trial court level, evidentiary issues because someone who is a 30B6 witness may also be a sole proprietor... He didn't testify that there was a public use here. I'm sorry? He didn't testify that there was a public use. He said that the Cherry 5 had all the claim limitations in it, but he didn't testify, and there wasn't any admission that there was a public use. If I read Minnesota Mining correctly, it says it's got to be used for the intended purpose. And this thing wasn't used for the transmission of data, right? By miscellanear, it certainly was. As insufficient... It was shown to the investors. It was not used for its intended purpose, right? By miscellanear, it definitely was used for its intended purpose. Wait, wait. I'm asking about showing it to the inventors. It was shown around to the inventors. It wasn't used for its intended purpose at that point, right? It was used for what the inventor and more to the point the two patents as finally issued said was critical to the invention. Critical to the invention and encompassed within the scope of the claims was not the fact that this had to be plugged in. What was critical and was used was the ergonomic features. How do you know if it's a boat motor if you don't even put it on a boat? I'm sorry? How do you know if it's a boat motor if you don't even put it on a boat? How do you know if this is a computer, if you don't even hook it into a computer? Well, first of all, again, it was hooked into a computer at least twice. Second of all, what drives you is the claim. What's the claim? The claim drives everything in our world. What's the claim? As Judge Moore pointed out before and as the face of the patent says, the claim does not include as an invention plugging the keyboards into a computer. That's well known. We know that's what keyboards like this do. We know when Ms. Lanier used the keyboard, data was entered. We know when the inventor used it. But Ms. Lanier's use is only good with regard to the child patent continuation, right? Because she's not homeward critical data carrier. That's correct. But there was also earlier use that's in the record of where Mr. Gambaro operated the keyboard while Ms. Roberts served. That's in the record page 8221, line 5 to 8222, line 7 according to my notes. And that's early enough to also reach back. Who's Ms. Roberts? Ms. Roberts is one of the people. Kathy Roberts, she was a friend of his, excuse me, Your Honor, who saw the Cherry 5 keyboard model. I'm reading my notes too fast. The Cherry Model 5 keyboard in operation and used the keyboard that appears in the record page. That's in his house, right? Yes. So doesn't he have an anticipation of confidentiality when he's showing somebody something in the house under moleculon, which was not even in the house, it was in the office? Your Honor, as I understand, moleculon doesn't stand for a broad proposition that depending upon where you are when you're trying to decide whether commercial use is being made of an invention, a violation of 102B, that it depends upon where you're standing at that time. No, they were pretty clear that the confidentiality was impliedly preserved by him keeping it in his office. But what drove moleculon, Your Honor, was not just a question of was there confidentiality or not. What drove moleculon was, was there an attempt at commercial use? That drives everything here. There's no question on this record that this man was commercially using this for way longer than the statute provides. Your Honor, the only commercial use was showing it to investors. If he had a conference and he offered to sell the patent or to license the patent, and that's what he'd done, that would not be a public use. That's not a commercial use. What's the difference if he's trying to sell stock? Because he wasn't trying to sell stock. This is very much like, I think, the closest case looking at the various cases on this fact. We don't have a fact situation that's identical, but I think Netscape is probably the closest case here where there the public use, and public use was found, the patent was invalidated, was a demo geared to making a remote database object more commercially attractive. That's not much different than, and the NDAs, if you look at the NDAs, the NDAs flat out say they're for the purpose of commercial evaluation. That's what he's doing with these things. He's trying to get people to invest in the company, right? No, he's trying to get people to give him money so he can take an admittedly reduced, fully reduced to practice invention. How do you know it's fully reduced to practice? I'm still struggling with... Because he admitted it, Your Honor, about six weeks from Sunday. I'm still struggling with the idea of how, if it's not ever plugged in, how do you know if those key movements have connected you to anything and properly transferred information? That's what the patent talks about. You have to transmit information. Your Honor, with respect, when you make admissions, you have to live or die by the admissions. These admissions were made in judicial proceedings. They were made in 30B6 depositions. He relied on the reduction of practice date in 19, the reduction of practice date, and that interference? That's a judicial admission. It tells you, given its best reading, tells you, okay, the Cherry 5 embodied the invention. It doesn't reach the conclusion of public use, which is what we're examining. Was there a use? How could there be a use if it wasn't even plugged in and you don't know if it worked or its intended purpose? We don't even know if it was reduced to practice. Well, the reduction of practice is admitted. It was admitted in the context of the Goddard interference. It was admitted several times. So from an evidentiary standpoint, on this record, as to whether the summary judgment was proper, with respect, I suggest that's blocked. Now, on the question of the commercial use, there's no question that he admitted reduction of practice. There's no possibility of experimental use here before it was put in place. If you look at the overall body of precedent, 3M, again, with respect, is enablement. There is no one case that says you've got to use the thing, particularly not in the context, as Judge Moore pointed out. What's covered here is not a keyboard plugged into a computer. They could have written a claim that way. They could have put method of use claims in either of these cases. They didn't. And that's why I'm emphasizing to you, Your Honor, that as with everything else in our world, public use is driven by the claim. You publicly use what's in the claim. Commercial use... Your Honor, that phrase... Your Honor, with respect, that's an intended use phrase in a claim. That's not a method of use. The court finds that there's no public use because there wasn't any showing that the mixture was applied because there's a transmission device. That is not a claim limitation. It's the purpose of the device. And the court... We held that there has to be a finding that it was used for its intended purpose. Now, what happened in 3M, with respect, Your Honor, was the question was, they sent out two components with insufficient... The Rico-Seal, I think, was the prior... They sent the two components out and there weren't sufficient indicia of instructions as to what was what. There are two parts to that case. There's a public use part in which the court said it wasn't enabled, and then there's an on-sale part. Your Honor, I believe, and I'm sorry I don't have the case right in front of me. It's in my brief bag, but I'm not going to interrupt it or grab it. I believe where Your Honor is looking is in the second part of the case, the public use part. No, it's the public use part. My recollection of the case, if I know it, is on the public use, the question was enablement. There certainly is an enablement issue. But in any event, there is a huge body of precedent. 3M is not precedential and controlling in view of all these other cases. There's a huge body of precedent that says in this type of claim where he's disavowed the very act that you're suggesting has to be in public use. It's in the spec in both cases. Commercial use for a keyboard that everybody knows what a keyboard is for can be satisfied simply by doing what he was doing with it. What do you have for us on infringement? Well, what I have for you on infringement, Your Honor, is... Can I just on the use for a second? Here, there's two more because obviously this is taking a lot of the Court's attention. Mr. Gambaro, at record page A202, talking about what he did with the investors, quote, I showed them how it worked and I told them about how it worked, close quote. Mr. Coulter, at record page A999-1000, quote, I did in fact make disclosures to potential investors. Some of the investors handled the models, period, close quote. These people picked the keyboard up. They were able to test its ergonomic features. The inventor described all this to them. That, with respect to this Court's precedent and under the precedent of many other courts, is sufficient because of the broad public policy purpose of public use. On infringement, Your Honor, my position with regard to Nokia is that Judge Aitken was dead flat on on the claim construction. She got it right. Concavity in said housing at said key activation position, a thumb associated with clustering of keys forming a keyboard within said concavity. Why do you think he's right? The phone is within the shell? It's beneath the top surface of the shell so it's in the depression. Well, because the depression, the hole as it was, and you can see this in page A16 of our brief, is as good a place to look as any. That's a hole. That has to be a concavity. And what is in the hole, under the hole is the guts of the phone. The keypad does have some curvature to the top of the keypad, but the bottom of the keypad is flat. There's no concavity. Absolute concavity. There's no literal infringement. Absolute concavity. There can be infringement under the doctrinal equivalence for a number of reasons, vitiation being one, Wilson Sporting Goods, reCAPTCHA, Linebinder, the IBM reference being another. But there simply is nothing in a Nokia phone, none of these phones, that have a cavity in the housing as defined by Judge Aiken, or a thumb-associable cluster of keys forming the keyboard within the cavity. The keyboard's got to be in the cavity. The keyboard's got to be in the cavity. The whole keyboard in the cavity. There is not one Nokia phone that was accused of infringement here that has that feature. Those features could literally be part of the doctrinal equivalence. I'd better let you go to counsel. All right, go ahead. All right, thank you. Please support Chris Carroll for Lyndon Microsoft Corporation. Federator, I want to go right to your question about handheld, and that is that how do defendants deal with the issue of handheld, and specifically, the extra control stick embodiment? And the answer is that nothing in the specification describes the control stick embodiment as being handheld. If you look at Columns 7 and 8 in the specification, a number of systems attached to a larger device. Why isn't that a joystick attached to a larger device than an airplane controller? Well, it does describe a control stick as attached to another device. What I'm saying, Your Honor, is that it says it does not describe that particular embodiment as being, quote, handheld. Other potential alternative embodiments, including a handheld calculator, a handheld remote control unit, and a handheld device for scanning objects, are expressly described as being alternative embodiments that are indeed handheld. But a control stick, from handheld to that, it doesn't describe the control stick as handheld. That's the distinction the patent makes. Counsel, doesn't the district court seem to suggest that there's no infringement because these things have to be suspended in the air by one hand? I don't see that anywhere in the claim as a requirement. Where that comes from, Your Honor, is the word handheld for holding in one hand. And the definition of handheld or the definition of held is actually ambiguous if you look in dictionaries. Dictionaries, some say gripped, some say supported by wind. So the definition there would be My red light is on, Your Honor. May I? Please, please. So the dictionary definitions could possibly, in the abstract, support both definitions. That line of cases went away with Phillips. An inventor is not entitled to all potential definitions of the dictionary. Instead, we have to look at the intrinsic evidence to determine which of the possible dictionary definitions is the one that applies. And in this specification, the applicant was very good at distinguishing between gripped and held. They used them as different concepts both in the claims and in the specification. And based on that, the district court said we have to look at the intrinsic evidence that here the intrinsic evidence says it can't just be gripped because the Federal Circuit's case law says that when you use two different terms, you should give them different meanings both in the specification or in the claim itself. I'd be glad to answer any other questions on any other terms. I think we have your argument. Thank you very much. Your Honor, I apologize for splitting up the... I think you got the message, but that's not usually very... I got it. Go ahead. Yes. Your Honor, Judge Atkins did a tremendous job. You got one minute to make a point. Got it. No cavity with keys in this at all. They're all stuck up there. The Doctor of Equivalence, you said, how can you tell if they're ever hooked up if they weren't? Well, it should apply to the Doctor of Equivalence. I'm fighting a ghost. He never provided any evidence before the lower court that this thing was ever hooked up or that you could take a thumb and just roll it in a small motion with 12 keys underneath it. If you try to do that with this, you're going to have double entries. You're going to have a frustrated gamer. Your Honor, I'm sorry. Thank you. Your call. Judge Bob, you can use the joint and the tip in the manner of the 322 here. The cavity is formed by the circle. Isn't he right that if you have a plurality of keys there, there's going to be no way to accurately enter information? It's going to be a mismatch. I think he's incorrect. The district court considered the question of whether the actuation method was allowable, concluded that represented a disputed issue which, in fact, they did not appeal that finding. So that goes back to them to argue that we're trying. But counsel, any concavity in that device seems to be in the surface of the keys, not in the housing. You seem to ignore the fact that the claims require the concavity in the housing. I am arguing, Doctor, that equivalence for the joystick is there's evidence in the record that to one reason or skill in the argument that they're the same. I would say that the best argument they make is, well, the keyboard is the concavity. It's not within the concavity. And I would say concavity is cavus, cave. You go into a cave. You touch the wall. The wall that you touch in the cave is within the cave. So you acknowledge that literal infringement is not met because the concavity is not within the housing. It's only on the keys. For some of the joysticks, that's true. As a matter of fact, most of them probably. And for document equivalence, if I understand it right, the pieces of evidence you rely upon are the adventurous declaration, the claim charge says nothing other than structural and equivalence with regard to each element. There's no particularized testimony whatsoever. And what was the third piece? The testimony was particularized in the sense of demonstrating a concavity by measurement. So I would say it's not particularized. Each of these models has been carefully analyzed to show the presence of a concavity by measurement. Where is that evidence? In the claim charts. And in the claim charts, you can see in the back there, the appendix is somewhere perhaps in the 800 range. Every model is done separately. Every measurement is done separately. Was the claim chart supported by a declaration? Yeah. Mr. Stewart's declaration. He said that the claim chart reflects my analysis. I have to find what supported the declaration, but they're his claim charts, and he did them. All I can say. But where do I find his declarations? There are several declarations. The second supplemental declaration appears on page 825 and 826. He says these are the claim charts. He's prepared them. And then the claim charts are... The counts with regard to the claim charts, with regard to equivalents, all they ever say, they repeat the same language over and over again. For example, on page 863, Nokia 620 cell phone contains the elements structurally or equivalently of each claim 322 that are present. Boom. How is that particularized testimony about how these two things are equivalent? Because he defines what the concavity is specifically for each phone. And I guess I've always thought this was a sufficiently simple argument that it could be addressed in that fashion. I mean, either one regards the top of the keytop surfaces as equivalent or not. We have the testimony from one substantial skilled in the art. They are. And to me, having a whole lot more than that is just... It just becomes repetitive. If I may say one thing... I mean, weren't our functional way results less of interchangeability? None of these things are mentioned anywhere. You just say they're structurally or equivalently present. I was not aware that this court had a case that said that one had to have expert evidence concerning whether or not whether or not each... I guess I don't even see it. If the testimony is conclusive in the sense that it says that these keytop surfaces are substantially equivalent to the cavity in the housing, that's the whole argument. I mean, there isn't a whole lot more detail than that. Either it works or it doesn't. You didn't have an expert or someone skilled in the art to address that question. We have... Mr. Stewart testifies in his declaration that he, with the assistance of him, Mr. Gambaro, prepared these claim charts. There's been no challenge that Mr. Gambaro's not reasonably skilled in the art. And we have Mr. Gambaro's testimony as someone who's reasonably skilled in the art that, in fact, these things are substantially equivalent and, in fact, would be obvious to one skilled in the art. And that's all on the record by sworn testimony. But it's just a conclusory statement. In the sense... It's conclusory in the sense that we demonstrate the existence of this concavity in the key-top surfaces and we say, in substance, yes, if we have a hole around here, it creates the same effect. And that's all there is to it. It's not a really complicated pattern. And so when you say conclusory, I don't know how you... what is really added by spinning it out anymore. What's happened is that Mr. Gambaro, the only thing he says at all on equivalence is in his declaration in paragraph 4 where he says, no, the key denies that a concavity formed by the top surfaces of a cluster of keys is the functional equivalent of a concavity in the housing as those terms are used in the 322 patent. I think it would be obvious to one of skill in the art of ergonomic keyboard designs that the two are interchangeable. That's all he says. How is that particularized testimony that is going to help us understand whether a concavity in keys is the same as a concavity in a housing? He just said he thinks the two are interchangeable. That's it, period. He offers nothing in terms of how the two work, how the thumb actuation would or would not operate. No specifics whatsoever. Our case law is clear. The particularized testimony is required. There is in the record substantial particularized testimony that goes down to in the district court there's a video, I don't know if I filed a video or not, but we have frame-by-frame grabs of him dialing this thing with the 322 method and showing the functional equivalent of these buttons in this concavity with these buttons in this concavity. It's like a comic book. Action by Gambaro. Dial this, dial that. It works the same way. I don't know what more you need. I guess I'm missing what it is that one could do beyond showing that you dial this one and you dial this one and it works the same way. So it sounds kind of conclusory because it's simple. I would say it's simple rather than conclusory. Can I say one more thing? The only thing I'd like to say is the last thing about handheld and printable, if you read the claim specification, grippable really helps, the meaning that's connoted by that is it helps orient the thumb to be able to dial the thing. And the grippable language comes in this discussion of how the thumb is free to dial. And that's more of the meaning that was defined with that. But anyway, thank you very much. Thank you very much, counsel, both sides.